UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
SKOCZYLAS,

             Plaintiff,

       - against -

UNITED STATES OF AMERICA,

          Defendant and Counter-Claimant,

       - against -

BREEN, et al.

          Counter-Defendants,
------------------------------------------------------x

**MEMORANDUM AND ORDER**

09 Civ. 2035 (ILG) (RML)

GLASSER, Senior United States District Judge:

     Plaintiff Dvora Skoczylas ("Skoczylas" or "plaintiff") brings this action to abate a trust fund recovery penalty that the Internal Revenue Service ("IRS") assessed against her pursuant to § 6672 of the Internal Revenue Code of 1986, as amended (the "Code"), and to recover partial payments she made to satisfy this penalty.  The government brings counterclaims against both Skoczylas and John Breen ("Breen") for full payment of assessed tax penalties with interest.  Currently before the Court are motions and cross-motions for summary judgment by all parties.  For the reasons that follow, Skoczylas' motion is DENIED, the government's motion against Skoczylas is DENIED, Breen's motion is GRANTED in part and DENIED in part, and the government's motion against Breen is GRANTED in part and DENIED in part.

## I.  BACKGROUND

### A.  Facts

Unless otherwise noted, the following facts are undisputed.  Long Island Health Associates Corp. ("LIHAC") was formed in 1996 with two shareholders, Dr. Irwin Mansdorf and Dr. Tali Skoczylas, plaintiff's husband, to acquire Hempstead General Hospital ("HGH") out of bankruptcy.  Certification of Jeremy M. Klausner dated Mar. 19, 2012 ("Klausner Cert."), Ex. 1 (Lanzafame Dep.), at 8-14, 19; Ex. 3 ¶ 2 (Dkt. Nos. 26-4, 26-6).  Shortly thereafter, Dr. Skoczylas transferred his 50% stake in LIHAC to his wife, the plaintiff (hereinafter "Skoczylas"), for no consideration.  Id., Ex. 1 (Lanzafame Dep.), at 19-20; Ex. 4 (Skoczylas Dep.), at 16.  After acquiring the shares, Skoczylas served on LIHAC's Board of Directors as Chairman or President of the Board.  Id., Ex. 4 (Skoczylas Dep.), at 12.  Skoczylas received no compensation or reimbursements for her services as a director of LIHAC, and received no dividends from her ownership of LIHAC stock.  Dvora Skoczylas' Statement of Material Facts in Support of Motion for Summary Judgment dated Mar. 19, 2012 ("Pl.'s 56.1") ¶¶ 37-39 (Dkt. No. 26-1).  In 1999, LIHAC completed its acquisition of HGH and changed the hospital's name to Island Medical Center ("IMC").  Klausner Cert., Ex. 1 (Lanzafame Dep.), at 10-11; Pl.'s 56.1 ¶ 25.  In July 2000, Dr. Mansdorf transferred his shares of LIHAC to Skoczylas for no consideration because he was leaving the country, making Skoczylas the 100% shareholder effective November 2, 2000.  Pl.'s 56.1 ¶¶ 73-75, 95.

During her tenure as a director of LIHAC, Skoczylas attended every Board meeting.  Id. ¶¶ 68-69.  At the July 25, 2000 Board meeting, then-Chief Financial Officer ("CFO") Walter Schatz ("Schatz") "painted a grim picture of LIHAC's financial condition" and "stated that the administration was very concerned with meeting payroll and payroll tax obligations."  Id. ¶ 72.  In August 2000, LIHAC began to contemplate bankruptcy.  Klausner Cert., Ex. 18.  At an emergency September 7, 2000 Board

meeting, both the Board and management agreed that bankruptcy was the only viable financial option. Pl.'s 56.1 ¶ 85. On October 3, 2000, LIHAC filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. Id. ¶ 86. From October 2000 through about December 2003, LIHAC operated as a debtor-in-possession. Id. ¶ 96.

As a debtor-in-possession, LIHAC was required to file Monthly Operating Reports ("MORs") with the bankruptcy court. Id. ¶ 97. These reports contained tax information, among other things, and were prepared and signed by Schatz from October 2000 through February 2001. United States' Local Rule 56.1(a) Statement dated Mar. 22, 2012 ("Gov't's 56.1") ¶¶ 12-14 (Dkt. No. 27-2).[1] On or about September 1, 2001, Schatz hired Gary Hung ("Hung") as LIHAC's Controller and Schatz resigned a few weeks later. Pl.'s 56.1 ¶¶ 102, 104. Hung's staff prepared the MORs for the remainder of the debtor-in-possession period, subject to review by Hung. Declaration of Attorney Reiser dated July 12, 2012 ("Reiser Decl."), Ex. 7 (Hung Dep.), at 177-79 (Dkt. No. 43-9). Hung officially became CFO around May 2003, but this was merely a title change because "Controller and CFO were the same thing." Pl.'s 56.1 ¶¶ 168, 170.

In September 2001, then-CEO David Bukstel ("Bukstel") hired Breen as Chief Operating Officer ("COO") to "oversee the clinical operations of the hospital," ensure regulatory compliance, and act as "an assistant to the CEO." Reiser Decl., Ex. 1 (Breen Dep.), at 15-16. In May 2002, Bukstel resigned and Breen was promoted to CEO effective June 1, 2002. Id. As CEO, Breen hired both financial and operations personnel. Although he did not become CEO until June 2002, Breen signed MORs from

---

[1] After LIHAC declared bankruptcy, it experienced management changes in 2000 and 2001 and attempted to attain not-for-profit status, which has no relevance to this action. Gov't's 56.1 Opp'n ¶¶ 87, 89, 92-94, 100, 122-23.

December 2001 through December 2002 because the MORs from December 2001 through June 2002 were not filed until after he became CEO.  Id. at 46-47, 241; Gov't's 56.1 ¶¶ 14, 36.

As Controller, Hung oversaw LIHAC's payroll department from September 2001 through August 2003.  Pl.'s 56.1 ¶ 177.  Hung's staff prepared, signed, and filed IRS Forms 941 on behalf of LIHAC under his supervision.[2]  United States' Local Rule 56.1(b) Statement of Genuine Issues to be Tried dated July 6, 2012 ("Gov't's 56.1 Opp'n") ¶ 184 (Dkt. No. 36-1).  Hung's staff, also under his supervision, transmitted funds to the IRS for payroll taxes each quarter; if there was a balance of payroll taxes due at the end of the quarter, Hung's staff was supposed to write a check to the IRS to cover it.  Id. ¶¶ 185-86.  But, during Hung's tenure at the hospital, there were times when there were insufficient funds to cover the payroll taxes.  Pl.'s 56.1 ¶ 194.  As a result, Hung independently decided that LIHAC should pay its payroll expenses before its payroll taxes during the first three quarters of 2002 and the first two quarters of 2003.  Id. ¶ 199.  He testified:

> Q.  What was your testimony?
> A.  Okay.  My testimony was that I paid payroll first and paid the payroll taxes when we can pay them.
> Q.  But that was your decision; correct?
> A.  Yes.  Because the money was there I had to pay payroll first.
> Q.  Did anyone help you?
> A.  No.  Because payroll had to go first.
> Q.  So you did make that decision on your own?
> A.  To pay payroll, yes.

---

[2] IRS Form 941 is an employer's quarterly federal tax return.  Employers are required to withhold payroll taxes from employees and report them quarterly on Form 941.  See 26 U.S.C. §§ 3102(a), 7501(a); 26 C.F.R. § 31.6011(a)-4.

Reiser Decl., Ex. 7 (Hung Dep.), at 186-87.  Because Hung decided to pay payroll expenses first and there were insufficient funds to cover both payroll expenses and the payroll taxes, LIHAC did not fully pay federal payroll taxes in the first three quarters of 2002 and the first two quarters of 2003.  Id. at 96-99; Pl.'s 56.1 ¶ 222.  As LIHAC's finances continued to deteriorate, IMC ceased operations on July 24, 2003, Hung was laid off in August 2003, and LIHAC's Chapter 11 bankruptcy was converted to a Chapter 7 bankruptcy on December 2, 2003.  Pl.'s 56.1 ¶ 206-07, 213.

**B.  Disputed Facts**

The parties dispute Breen's knowledge of LIHAC's failure to pay federal payroll taxes in 2002 and 2003.  Breen testified that he "had regular discussions with Gary Hung about the hospital's financial condition, which included discussions about all liabilities and specifically the tax liability."  Reiser Decl., Ex. 1 (Breen Dep.), at 102.  He claims that he had no knowledge of any unpaid federal tax liabilities until late 2003 because of Hung's assurances and the misleading reports Hung prepared.  Id. at 103-04; Ex. 3.  Breen also testified that he thought payroll taxes were paid because he saw wire transfers to the IRS on operating statements, but was not aware that these were only partial payments by Hung.  Id., Ex. 1 (Breen Dep.), at 65-70.   Contrarily, Hung claims that he informed Breen at some point in 2002 that taxes were not paid.  Id., Ex. 7 (Hung Dep.), at 117.  He testified:

> Q.  What exactly did you say to Mr. Breen at this meeting in his office?
> A.  That taxes weren't paid.  "We're not current with the tax liabilities."
> Q.  What did Mr. Breen say?
> A.  He didn't say anything at all.

Id. at 117-18.  The government also contends that Breen was aware of the unpaid taxes because each MOR filed with the bankruptcy court, most of which Breen signed,

"contained a schedule of Post-Petition Taxes that revealed escalating balances of unpaid federal employment tax liabilities for the periods from January 1, 2002 through December 31, 2002." Gov't's 56.1 ¶ 43. Breen counters that the Post-Petition Taxes document appended to the MORs did not show that that there were unpaid federal employment taxes, and that he lacked the financial sophistication to understand payroll tax information. Response on Behalf of John Breen to United States Local Rule 56.1 Statement dated July 12, 2012 ("Breen's 56.1 Opp'n") ¶ 43 (Dkt. No. 41); Reiser Decl., Ex. 1 (Breen Dep.), at 17-23, 44-45, 178.

The parties also dispute Skoczylas' role, knowledge, and level of involvement in LIHAC throughout the debtor-in-possession period from October 2000 through about December 2003. While the parties agree that Skoczylas was involved in LIHAC's decision to declare bankruptcy, Pl.'s 56.1 ¶¶ 78, 85, she claims that she had "no role" afterwards and was not involved in the decision to terminate the hospital's management company, hire a new management company, or hire a new CEO because she was cut out of the decision-making process. Id. ¶¶ 81, 83, 89-90, 92-94. The government disputes this, arguing that Skoczylas was involved in the decision to hire a new management company and that she signed MORs from March 2001 through November 2001. Gov't's 56.1 Opp'n ¶¶ 81, 83, 89, 92-94, 99. The parties agree that Skoczylas was not involved in hiring Hung, Pl.'s 56.1 ¶ 103, but dispute whether she was involved in hiring Breen or promoting him to CEO. Gov't's 56.1 Opp'n ¶¶ 111, 115-17; Dvora Skoczylas' Reply Statement of Material Facts in Support of Motion for Summary Judgment dated Aug. 5,

2012 ("Pl.'s 56.1 Reply") ¶¶ 111, 117 (Dkt. No. 48-1).[3]  The parties agree that Breen signed the MORs once he became CEO, Pl.'s 56.1 ¶¶ 119, 121, but they dispute whether he provided them to Skoczylas.  Gov't's 56.1 Opp'n ¶ 120.  Skoczylas argues that as CEO, Breen reported to a group of creditors termed the "Parties in Interest," not the Board, and she was cut out of all management functions, Pl.'s 56.1 ¶¶ 128-46, 154-67, which the government disputes.  Gov't's 56.1 Opp'n ¶¶ 128-37, 143-46, 159-60.  The government argues that Skoczylas was involved in financial management because her signature appears on every payroll check, she had check-signing authority over LIHAC's bank accounts, and she signed LIHAC's corporate tax return in 2000.  Gov't's 56.1 Opp'n ¶¶ 182-83; Gov't's 56.1 ¶¶ 20-21.  Skoczylas counters that she was unaware of the printed signature on the payroll checks, she only technically had authority over LIHAC's bank accounts, which she did not use, and her tax return signature was purely ministerial.  Pl.'s 56.1 Reply ¶ 183; Plaintiff's Opposition to Defendant's Statement of Material Facts dated July 6, 2012 ("Pl.'s 56.1 Opp'n") ¶¶ 20-21 (Dkt. No. 35-2).

The parties agree that from September 2002 through December 2002, the IRS corresponded with Hung regarding LIHAC's unfiled payroll tax returns.  Reiser Decl., Ex. 4.  Hung testified that he stored all IRS correspondence in a filing cabinet and did not share it with Breen or the Board, including Skoczylas.  Id., Ex. 7 (Hung Dep.), at 89-90, 92-94.  As a result, the correspondence was not discovered until September 2003 by a financial consultant, at which point Breen contacted the IRS.  Reiser Decl., Ex. 6 ¶ 10.  Breen testified that he offered to pay part of the delinquent tax liability using LIHAC's available funds, but the IRS could not accept payment because the funds were

_____

[3] Although Local Civil Rule 56.1 does not require a reply statement of facts by the movant, it also does not forbid it.  Therefore, the Court will consider reply statements of facts.

encumbered by the bankruptcy.  Reiser Decl., Ex. 1 (Breen Dep.), at 85-86.  The government disputes this, arguing that LIHAC had access to nearly $2 million in unrestricted funds that Breen did not use to satisfy the tax liability.  Gov't's 56.1 ¶ 45.  Skoczylas testified that when she was informed of the tax liability, she asked Breen if LIHAC could use its remaining funds to pay the IRS, but Breen replied that it could not due to the bankruptcy.  Klausner Cert., Ex. 4 (Skoczylas Dep.), at 84-85.

### C. Procedural History

In late 2004, the IRS Revenue Officer assigned to this case contacted Skoczylas regarding potential personal liability for LIHAC's unpaid payroll taxes under § 6672 of the Code.  Pl.'s 56.1 ¶ 215.  On September 12, 2006, the Revenue Officer sent Skoczylas a letter proposing to assess a penalty against her pursuant to § 6672.  Klausner Cert., Ex. 39.  On November 10, 2006, Skoczylas protested the penalty, and on February 11, 2008 the IRS rejected the protest.  Id., Exs. 40-41.  On July 31, 2008, Skoczylas appealed the penalty to the IRS Appeals Office, which declined to abate the penalty on November 17, 2008.  Id., Exs. 42-43.  In December 2008, the IRS assessed the penalty against Skoczylas, and on January 12, 2009, Skoczylas submitted IRS Form 843 requesting a refund and abatement.  Id., Ex. 44.

After exhausting her administrative remedies within the IRS, Skoczylas initiated this action to "abate the remaining outstanding balance of the Trust Fund Recovery Penalties assessed against" her and to recover money already paid to satisfy the penalties.  Complaint dated May 13, 2009 ("Compl.") ¶¶ 4, 53 (Dkt. No. 1).[4]  In response, the government brought counterclaims for full payment of the penalties with interest

---

[4] The Complaint refers to "Trust Fund Recovery Penalties" because payroll taxes that employers deduct from employees' wages are held by the employer in a special trust fund for the government's benefit.  See 26 U.S.C. § 7501.

and interpleaded Breen.  United States' First Amended Answer and Counterclaims dated June 18, 2010 ("Countercl.") (Dkt. No. 12).

On March 19, 2012, Skoczylas moved for summary judgment on her claims against the government.  Memorandum of Law in Support of Dvora Skoczylas' Motion for Summary Judgment ("Pl.'s Mem.") (Dkt. No. 26-2).  The government filed its opposition to Skoczylas' motion on July 6, 2012, United States' Memorandum of Law in Opposition to Plaintiff's Cross Motion for Summary Judgment ("Gov't's Opp'n") (Dkt. No. 36), and Skoczylas filed her reply on August 5, 2012.  Reply Memorandum of Law in Further Support of Dvora Skoczylas' Motion for Summary Judgment ("Pl.'s Reply") (Dkt. No. 48).  On March 22, 2012, the government moved for summary judgment against both Skoczylas and Breen.  Memorandum of Law in Support of the United States' Motion for Summary Judgment as to Dvora Skoczylas and John Breen ("Gov't Mem.") (Dkt. No. 27-1).  Skoczylas filed her opposition to the government's motion on July 6, 2012, Dvora Skoczylas' Memorandum of Law in Opposition to United States' Motion for Summary Judgment ("Pl.'s Opp'n") (Dkt. No. 35), and the government filed its reply on August 5, 2012.  United States' Reply to Dvora Skoczylas' Memorandum of Law in Opposition to United States' Motion for Summary Judgment ("Gov't's Reply to Pl.") (Dkt. No. 47).  On July 11, 2012, Breen moved for summary judgment against the government and opposed the government's motion in the same filing, Memorandum of Law on Behalf of John Breen in Opposition to the Motion of the United States for Summary Judgment ("Breen's Opp'n") (Dkt. No. 40),[5] and the government responded

_____

[5] Breen's motion for summary judgment, despite spanning 79 pages, does not contain a statement of material facts in numbered paragraphs as required by Local Civil Rule 56.1(a).  "Failure to submit such a statement may constitute grounds for denial of the motion."  Local Civ. R. 56.1(a).  Nonetheless, for the sake of efficiency and in light of

on August 31, 2012.  United States' Reply to John Breen's Memorandum of Law in

Opposition to United States' Motion for Summary Judgment ("Gov't's Reply to Breen")

(Dkt. No. 51).

## II.      Legal Standards

### A.  Section 6672

Section 6672(a) provides, in relevant part, that:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall . . . be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

"[U]nder section 6672(a), an individual may be held liable for unpaid withholding taxes

if: (1) he or she was a 'responsible person' for collection and payment of the employer's

taxes; and (2) he or she 'willfully' failed to comply" with statutory withholding tax

requirements.  Winter v. United States, 196 F.3d 339, 344 (2d Cir. 1999).  "The

assessment of the tax creates a prima facie case of liability, and the person against whom

the penalty is levied bears the burden of establishing by a preponderance of the evidence

that at least one of the two elements of section 6672 liability does not exist."  Schwinger

v. United States, 652 F. Supp. 464, 466 (E.D.N.Y. 1987).

Although "[n]o single factor is dispositive in evaluating whether an individual" is

a "responsible person" within the meaning of § 6672(a), "the determinative question is

whether the individual has significant control over the enterprise's finances."  Winter,

196 F.3d at 345 (internal quotation omitted).  To answer this question, the Second

---

the voluminous record, the Court will decide Breen's motion in conjunction with the
other parties' motions.

Circuit has developed a seven-factor test that directs courts to look at whether the individual:

> (1) is an officer or member of the board of directors, (2) owns shares or possesses an entrepreneurial stake in the company, (3) is active in the management of day-to-day affairs of the company, (4) has the ability to hire and fire employees, (5) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (6) exercises control over daily bank accounts and disbursement records, and (7) has check-signing authority.

Id. (internal quotation omitted).

"Even a responsible person may not be held personally liable under section 6672(a) unless his or her failure to collect, account for, or remit withholding taxes was willful." Id. "The principal component of willfulness is knowledge: a responsible person acted willfully within the meaning of § 6672(a) if he [or she] (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead." United States v. Rem, 38 F.3d 634, 643 (2d Cir. 1994). "Willful conduct may also include a reckless disregard for obvious and known risks as well as a failure to investigate after having notice that withholding taxes have not been remitted to the Government." Winter, 196 F.3d at 345 (quotations omitted). However, a responsible person will not be held personally liable under § 6672(a) if he or she reasonably believed that taxes were being paid. Id. at 345-36 (discussing a limited "'reasonable cause' exception to section 6672(a) liability").

## B. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law."  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation omitted).

The moving party bears the burden of establishing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  When the burden of proof at trial would fall on the non-moving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non-movant's claim.  Id. at 322-23.  To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)), and cannot "rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation omitted).  However, under § 6672(a), "[t]he person against whom the IRS assesses a § 6672 tax penalty has the burden of disproving [the tax liability], by a preponderance of the evidence."  Fiataruolo v. United States, 8 F.3d 930, 938 (2d Cir. 1993).

A court deciding a motion for summary judgment must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

"In the context of a section 6672(a) dispute, . . . summary judgment is appropriate where there are no genuine questions as to the assessed individual's control

of company funds and decision making authority, his or her knowledge of the deflection of company funds to payees other than the IRS, or the existence or reasonableness of his or her belief that the taxes were, in fact, being paid." <u>Winter</u>, 196 F.3d at 346.  "A court may grant summary judgment as to willfulness 'only when the facts are undisputed and application of the law to those facts will reasonably support only one ultimate conclusion.'" <u>Reiff v. United States</u>, 461 F. Supp. 2d 142, 154 (S.D.N.Y. 2006) (quoting <u>Winter</u>, 196 F.3d at 347).  While the individual has the burden of proof, if "the individual's position makes his [or her] claim of ignorance of nonpayment plausible and there are no other indicia of knowledge," <u>Rem</u>, 38 F.3d at 644, then "a question of fact exists as to willfulness." <u>Reiff</u>, 461 F. Supp. 2d at 154.

### III.   Discussion

#### A. Dvora Skoczylas

Skoczylas argues that she is not a "responsible person" under § 6672 and that even if the Court finds otherwise, it should still grant summary judgment in her favor "because she did not willfully fail to pay over LIHAC's trust fund taxes."  Pl.'s Mem. at 1. The government contends that Skoczylas is a "responsible person" who willfully failed to pay LIHAC's taxes, so the Court should deny Skoczylas' motion and grant summary judgment in the government's favor.  Gov't Opp'n at 1; Gov't Mem. at 18-19, 23-24. The Court finds the existence of genuine disputes as to material facts and denies both parties' motions.

#### 1.  "Responsible Person"

Under the Second Circuit's seven-factor test, two factors weigh in favor of the government, two factors weigh in favor of Skoczylas, and three factors turn on disputed

issues of material fact.  Therefore, summary judgment for either party under § 6672 is
not appropriate.

### i.    Officer or Member of the Board of Directors

The parties agree that Skoczylas was a member of the Board of Directors and
President of LIHAC.  Gov't's 56.1 Opp'n ¶¶ 15, 17.  Although they dispute the reach of the
title "President" and the importance of how frequently the Board met or that Skoczylas'
position was unpaid, Pl.'s Mem. at 6-9; Gov't's Opp'n at 5-6; Pl.'s Reply at 4, the dispute
is irrelevant because the issue is whether Skoczylas "is an officer or <u>member of the board
of directors</u>."  <u>Winter</u>, 196 F.3d at 345 (emphasis added).  Because it is undisputed that
Skoczylas was a director of LIHAC, this factor weighs in favor of finding that Skoczylas
is a "responsible person" under § 6672(a).

### ii.    Owns Shares or Possesses an Entrepreneurial Stake in the Company

The parties agree that Skoczylas was the 100% controlling shareholder at all
times relevant to this case.  Pl.'s 56.1 Opp'n ¶¶ 9-10.  Although Skoczylas argues that she
"was never a bona fide owner" and merely held the "ceremonial title[] of shareholder,"
Pl.'s Mem. at 14, she "concede[s] that she held legal title to the shares of LIHAC during
the periods at issue."  Pl.'s Reply at 4.  Because it is undisputed that Skoczylas was the
sole shareholder of LIHAC, this factor weighs in favor of finding that Skoczylas is a
"responsible person" under § 6672(a).

### iii. Actively Manages Day-to-Day Operations

The parties agree that "Skoczylas does not appear to have been active in the
management of the day-to-day affairs of LIHAC."  Gov't's Opp'n at 6.  Although the
government notes that Skoczylas was "kept apprised of [the] financial health of the

hospital," this is a far cry from active day-to-day management.  Therefore, this factor weighs against finding that Skoczylas is a "responsible person" under § 6672(a).

### iv. Has the Ability to Hire and Fire Employees

The parties dispute whether Skoczylas, as a director, had the ability to hire and fire employees.  The government argues that Skoczylas had this power because she participated in Board meetings that granted physicians hospital privileges and approved the hiring and firing of various executives.  Gov't's Opp'n at 7-8.  Skoczylas responds that the Board did not have real power to hire and fire because LIHAC was actually run by the Parties in Interest during the bankruptcy, not the Board.  Pl.'s Reply at 5-6.  Skoczylas also asserts that "granting privileges to physicians at a hospital is not hiring or firing employees."  Id. at 5.  Skoczylas is correct that granting a physician hospital privileges does not constitute an employment contract.  Lobel v. Maimonides Med. Ctr., 835 N.Y.S.2d 28, 29 (1st Dep't 2007) (citing Engelstad v. Virginia Mun. Hosp., 718 F.2d 262 (8th Cir. 1983)).[6]  The parties also dispute whether the Board or the Parties in Interest ran LIHAC during the bankruptcy, so there are genuine disputes as to material facts regarding this factor.

### v. Decides Which, When, and in What Order Debts and Taxes Will Be Paid

The parties agree that Skoczylas lacked the power to decide which, when, and in what order debts and taxes will be paid.  However, the government contends that because Skoczylas maintained signature power over LIHAC's corporate checking accounts, she "possessed final veto power" over paying payroll, debts, and taxes.  Gov't's Opp'n at 8.  That contention is unpersuasive given the Second Circuit's cautionary

---

[6] Although Skoczylas does not cite to any authority, LIHAC is governed by New York contract and employment law because it is a New York hospital.

language that "section 6672(a) is not meant to ensnare those who have mere 'technical authority.'" Winter, 196 F.3d at 345.  Therefore, this factor weighs against finding that Skoczylas is a "responsible person" under § 6672(a).

### vi. Exercises Control over Daily Bank Accounts and Disbursement Records

The parties dispute whether Skoczylas exercised control over daily bank accounts. The government contends, and Skoczylas does not appear to dispute, that "Skoczylas maintained check-signing authority on all of LIHAC's corporate checking accounts," "her signature was printed on all issued payroll checks," and she "exercised her signatory authority from time-to-time on LIHAC's operating account."  Gov't's Opp'n at 8.  However, Skoczylas argues that she "did not have possession or control of LIHAC's checkbook"; she "simply performed the ministerial act of signing the checks in an emergency."  Pl.'s Reply at 9.  The Second Circuit has held that "section 6672(a) was not intended to apply to an individual who lacks actual control over an employer's finances, even though he or she has technical authority by virtue of title or ownership interest." Winter, 196 F.3d at 346 (citation omitted).  Therefore, this factor depends on whether Skoczylas possessed actual control over LIHAC's checkbook and bank accounts, which is a disputed material fact.

### vii.    Has Check-Signing Authority

This factor turns on the same disputed material facts discussed above.

Skoczylas relies heavily on Simpson v. United States, 664 F. Supp. 43 (E.D.N.Y. 1987) (Glasser, J.), to argue that she should be granted summary judgment because the seven factors weigh against finding that she is a "responsible person."  In Simpson, this court held that the members of the Board of Trustees of a hospital were not "responsible

persons" under § 6672(a), denied the government's motion for summary judgment, and granted the Trustees' motion.  Id. at 48-50.  Skoczylas analogizes her case to Simpson and emphasizes that, like here, the Trustees in Simpson were unpaid and did not take the leading role in running the hospital.  Pl.'s Mem. at 6.  While the Court recognizes the "social value in having individuals agree to serve on the boards of hospitals," it also cautions that "unpaid service on the board of a not-for-profit institution should not confer automatic immunity from the strictures of section 6672."  Simpson, 664 F. Supp. at 49.  In Simpson, the Court found that the Trustees "did not sign checks" and "did not hire and fire employees," whereas here the Court finds genuine disputes as to material facts for both factors.  Id.  Therefore, Simpson, is distinguishable.

A more apt analogue is Winter v. United States.  In Winter, the government introduced evidence that Rita Romer was an officer, director, and shareholder who possessed check-signing authority and was involved in important operations decisions. 196 F.3d at 346.  In response, Romer introduced evidence that "she held her ownership interest and her titles merely as a convenience to her husband, who exercised effective control over her interest in the company," while "she had no decision-making authority."  Id.  Faced with this conflicting evidence, the court concluded that "there exists a genuine issue of fact as to whether she exercised 'significant control' over [the company's] finances or merely enjoyed a 'titular designation' at the company," so summary judgment was not appropriate.  Id.  Here, the government has introduced evidence that Skoczylas was a director and sole shareholder of LIHAC who may have possessed hiring, firing, and check-signing authority.  Conversely, Skoczylas has introduced evidence that she possessed little, if any, control over management,

17

operations, or finances.  As in <u>Winter</u>, this raises genuine issues of material fact that cannot be resolved at the summary judgment stage in favor of either party.

Under the totality of the circumstances, the seven-factor test does not warrant granting summary judgment to either Skoczylas or the government.  Accordingly, on the issue of whether Skoczylas is a "responsible person" under § 6672(a), both Skoczylas' and the government's motions are DENIED.

### 2. Willfulness

"The principal component of willfulness is knowledge," <u>United States v. Rem</u>, 38 F.3d 634, 643 (2d Cir. 1994), and, as discussed <u>supra</u>, the parties dispute Skoczylas' knowledge and involvement throughout the relevant period.  Although Skoczylas bears the burden of proof, she presents sufficient evidence of being unaware of LIHAC's failure to pay withholding taxes.  For example, Hung testified:

> Q:  So as far as you know, Ms. Skoczylas had no idea of the delinquency?
> A:  Correct.  I didn't say anything to her.

Reiser Decl., Ex. 7 (Hung Dep.), at 197.  Conversely, the government presents evidence that Skoczylas had access to, and at times even signed, documents that showed LIHAC's tax delinquencies.  Gov't Mem. at 23-24.  In light of these genuine disputes as to material facts, the issue of Skoczylas' willfulness cannot be resolved at the summary judgment stage.  Accordingly, both Skoczylas' and the government's motions are DENIED.[7]

---

[7] The government also contends that, in the alternative, Skoczylas should be held strictly liable.  Gov't Mem. at 26-27.  The government appears to base its argument on the allegation that LIHAC possessed unencumbered funds and chose not to use them to pay taxes, Gov't 56.1 ¶ 45, but offers no evidence to support the fact that the funds were unencumbered.  Breen's 56.1 Opp'n ¶ 45.  The government's theory of strict liability is contradicted by the text of the statute, which only applies to an individual who

### B.  John Breen

Breen concedes that he is a "responsible person" under § 6672(a) for most of the relevant time period, but argues that he is entitled to summary judgment because "there is no evidence that he acted willfully in causing any LIHAC payroll tax deficiency." Breen's Opp'n at 77.  The government contends that it is entitled to summary judgment because "Breen willfully failed to collect, truthfully account for or pay over LIHAC's withheld employment taxes to the IRS."  Gov't Mem. at 24-26.  The Court finds that Breen is a "responsible person" under § 6672(a) for most, but not all, of the relevant time period, but finds that there are genuine disputes as to material facts regarding Breen's willfulness.  Accordingly, it grants Breen's motion in part and denies Breen's motion in part, and grant's the government's motion in part and denies the government's motion in part.

#### 1.  "Responsible Person"

Breen's status as a "responsible person" turns on the precise timeline of events. As discussed supra, it is undisputed that LIHAC did not fully pay federal payroll taxes for the first three quarters of 2002 and the first two quarters of 2003.  It is also undisputed that Breen was COO during the first quarter of 2002, was promoted to CEO during the second quarter of 2002, and was CEO for all subsequent quarters in 2002 and 2003.

---

"willfully fails to collect such tax . . . or willfully attempts in any manner to evade or defeat such tax."  26 U.S.C. § 6672(a) (emphasis added).  Moreover, the Supreme Court has explicitly held that "the statute cannot be construed to impose liability without fault" because it "does not impose an absolute duty."  Slodov v. United States, 436 U.S. 238, 254 (1978).  The government's attempts to distinguish Slodov are unavailing, Gov't Reply to Pl. at 10-12, because the weight of authority holds that "[a]ttaining the status of a 'responsible person' does not . . . encompass strict liability for a company's tax delinquency."  Michaud v. United States, 40 Fed. Cl. 1, 23 (Fed. Cl. 1997).

The parties appear to agree that Breen was not a "responsible person" in the first quarter of 2002 when he was COO, and was a "responsible person" in the third quarter of 2002 and first two quarters of 2003 when he was CEO.  Breen's Opp'n at 34-36; Gov't's Reply to Breen at 2, 5-6.  But, they dispute whether Breen was a "responsible person" in the second quarter of 2002.  Breen argues that he was not a "responsible person" in the second quarter of 2002 because he was still COO for most of the quarter.  Breen's Opp'n at 34-36.  The government responds that Breen became CEO with 30 days left in the second quarter of 2002, so "there was sufficient time remaining . . . for Breen to determine the status of LIHAC's unpaid federal employment tax liability accruing during the second quarter"; therefore, Breen was a "responsible person" in the second quarter of 2002.  Gov't's Reply to Breen at 2, 5-6.  Since Breen was promoted to CEO partway through the second quarter of 2002, the Court finds that the extent of Breen's responsibility in the second quarter of 2002 raises genuine disputes as to material facts.  Accordingly, on the issue of whether Breen is a "responsible person," Breen's motion is GRANTED for the first quarter of 2002, and DENIED for all subsequent quarters, and the government's motion is GRANTED for the third quarter of 2002 and all subsequent quarters, and DENIED for all previous quarters.

### 2. Willfulness

Summary judgment is not appropriate on the issue of willfulness because the issue is a matter of credibility, which is a determination made at trial.  As discussed supra, Breen testified that he was unaware of the tax liabilities until September 2003, while Hung testified that he informed Breen in 2002.  Similarly, the government argues that Breen was aware of the tax liabilities in September 2002 based on the minutes of a meeting of the Parties in Interest, while Breen contends that he was discussing state

employment taxes.  Gov't's Reply to Breen at 10-11.  Finally, Breen contends that he did not read the tax information appended to the MORs he signed and, even if he had read it, he would not have understood it.  The government responds that even if Breen could not understand the tax information appended to the MORs, he showed a reckless disregard for the "known risk that LIHAC's employment tax liabilities would not be paid over to the United States" because "he utterly failed to conduct any investigation to assure himself that employment taxes were being paid over to the IRS."  Id.  Such factual disputes cannot be adjudicated at the summary judgment stage, so both Breen's and the government's motions are DENIED.[8]

## IV.   CONCLUSION

For the foregoing reasons, Skoczylas' motion is DENIED, the government's motion against Skoczylas is DENIED, Breen's motion is GRANTED in part and DENIED in part, and the government's motion against Breen is GRANTED in part and DENIED in part.

SO ORDERED.

Dated:        Brooklyn, New York
              December 3, 2012

_____/s/ ILG_____
I. Leo Glasser
Senior United States District Judge

---

[8] As with Skoczylas, the government also contends that, in the alternative, Breen should be held strictly liable.  Gov't Mem. at 26-27.  The Court rejects the government's argument for the same reasons.